Mark I. Labaton State Bar No.159555
**MOTLEY RICE LLP**
1801 Century Park East, Suite 475
Los Angeles, CA 90067
Telephone: 310-552-7992
Facsimile:  310-552-8054
mlabaton@motleyrice.com

```
          FILED
  CLERK, U.S. DISTRICT COURT

    SEP - 9 2013

 CENTRAL DISTRICT OF CALIFORNIA
 BY                    DEPUTY
```

Attorneys for the Relators

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. )<br>Mark Jean )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>DELTA TUCKER HOLDINGS, INC.; )<br>DYNCORP INTERNATIONAL INC.; )<br>and DOES 1-500 inclusive, )<br> )<br>Defendants. )<br>_____ ) | Civil Case No. **CV13-06583** SVW<br>(MRW)<br><br>COMPLAINT<br><br>**FILED UNDER SEAL<br>PURSUANT TO THE FALSE<br>CLAIMS ACT [31 U.S.C. § 3729<br>ET SEQ.]** |

Relator Mark Jean ("Relator") alleges the following:

### SUMMARY OF THE ACTION

1.     Relator brings this action on behalf of the United States of America

and the State of California to recover damages, civil penalties and other relief

2

False Claims Act Complaint

arising from false claims and false statements that Defendants made, or caused to be made, in violation of the Federal False Claims Act ("FCA").

2.     Defendant Delta Tucker Holdings, Inc. is a company incorporated in the State of Delaware.  It is the holding company that owns DynCorp International Inc., which wholly owns its operating subsidiary DynCorp International LLC.

3.     Defendant DynCorp International, Inc. ("DynCorp") is a company incorporated in the State of Delaware, conducting operations through its wholly owned operating subsidiary DynCorp International LLC.

4.     Delta Tucker Holdings, Inc., DynCorp. International, Inc. and DynCorp. International LLC regularly conduct business in the Central District of California.

5.     Defendant Delta Tucker Holdings Inc. describes itself in its 2012 Form 10-K annual report filed with the SEC, as "a leading provider of specialized, mission-critical professional and support services outsourced by the U.S. military, non-military U.S. governmental agencies and foreign governments. Our specific global expertise is in law enforcement training and support, security services, base and logistics operations, intelligence training, rule of law development, construction management, platform services and operations, and linguist services. We also provide logistics support for all our services."

False Claims Act Complaint

6.      DynCorp contracted with the U.S. Government from 1997 to 2010 to provide maintenance training and services for the F/A-18 fighter planes purchased by the Kuwait Air Force (KAF) from McDonnell Douglas (now Boeing).  This cost plus fixed fee contract was initially awarded in 1997 but was re-awarded in December 2005.   The Naval Air Systems Command in Patuxent River, Maryland issued the contract which is identified as contract N00019-06-C-0308. This case relates to DynCorp's continuous and knowing failure to perform its duties under that contract.

7.      As a material contract for DynCorp, the F/A-18 contract has been the subject of disclosures in the company's SEC filings.  DynCorp's 2006 Form 10-K described DynCorp's business, stating that, "our primary services are provided through our two core operating segments, International Technical Services and Field Technical Services."  "Key Field Technical Services Contracts" include "Contract Field Teams" which is described as "the most significant program in our Field Technical Services operating segment." The company disclosed that "the principal customer for our Contract Field Teams program is the Department of Defense," and that "[t]his program deploys highly mobile, quick-response field teams to customer locations to supplement a customer's workforce. Services

False Claims Act Complaint

under a Contract Field Teams contract generally include providing mission support to aircraft and weapons systems in addition to depot-level repair.[1]"

8.      Specifically concerning its F/A-18 contract, DynCorp disclosed that it held the contract from an initial award date in September 1997 and a later award date of December 2005 until a recompete date of December 2010. The company also disclosed that this contract had an estimated value of $70 million, for the December 2005 through 2010 period (later extended to June 2011).   The actual sum value of the contract and all its one-year segment awards for the 2005 through 2010 re-award period was $76,566,000.[2]

9.      Relator, Mark Jean, resides in Los Angeles County.

### JURISDICTION AND VENUE

10.     This is a civil action brought against Defendants on behalf of the United States of America pursuant to the *qui tam* provisions of the False Claims Act (31 U.S.C. §§ 3729-3732), to recover damages and civil penalties.

---

[1]     The Form 10-K for 2006 is used as a reference point because subsequent to that Form 10-K, the company cased to list the F/A-18 contract as a separate item, only listing contracts with contract values of significantly greater magnitude.

[2]     The initial award was $13.7 million, and each segment extension was valued as follows:  13,914,472 (2006-2007), $14,126,296 (2007-2008), $17,961,266 (2008-2009), $16,902,377 (2009-2010), and $13,661,622 (contract extension from December 2010 to June 2011).

False Claims Act Complaint

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345, and 31 U.S.C. § 3730(b).

12. Venue is proper pursuant to 31 U.S.C. § 3732(a), because this court is in a district where DynCorp and Delta Tucker Holdings transact business.

## PARTIES

13. Relator is an individual who is a citizen and resident of the County of Los Angeles, California.

14. Defendant Delta Tucker Holdings Inc. is a company incorporated in the State of Delaware with its headquarters and principal place of business located in Falls Church, Virginia and major administrative offices in Fort Worth, Texas. It is the holding company that owns DynCorp International Inc., which in turn wholly owns its operating subsidiary DynCorp International LLC. Delta Tucker Holdings Inc. was formed for the purpose of acquiring DynCorp International Inc. and had immaterial assets and virtually no operations prior to its merger on July 7, 2010 with DynCorp International Inc. Prior to the merger, DynCorp International Inc. was a New York Stock Exchange-listed company. Following the merger, DynCorp International Inc. was no longer publicly traded, and the equity of DynCorp was owned, through investment entities, by Cerberus Capital Management, a private investment firm.

False Claims Act Complaint

15.     Defendant DynCorp International, Inc. is a company incorporated in the State of Delaware, with its headquarters and principal place of business located in Falls Church, Virginia, with major administrative offices in Fort Worth, Texas.   DynCorp is a New York Stock Exchange-listed company, and it transacts business in the Central District of California.

16.     Defendant DynCorp International LLC is a corporation incorporated in the State of Delaware, with its headquarters and principal place of business located in Falls Church, Virginia and major administrative offices in Fort Worth, Texas.  Defendant DynCorp International, LLC, is the wholly-owned operating subsidiary of DynCorp International Inc., through which its parent company conducts its operations.

17.     The named defendants are herein collectively referred to as "DynCorp."

## THE CONTRACT REQUIRED DYNCORP TO PROVIDE MAINTENANCE AND QUALITY ASSURANCE SERVICES AND TO TRAIN KUWAITIS TO PERFORM THOSE TASKS

18.     The April 29, 2005 solicitation for bids for the Kuwaiti F/A-18 maintenance and training contract, as well as, the July 1, 2005 amended solicitation, each included as attachment 1 a Statement of Work ("SOW") that reflected DynCorp's obligations under that Government contract.   Although the contract was designed to train Kuwaitis to independently perform maintenance and quality performance tasks, the contract directly required DynCorp to perform

7

False Claims Act Complaint

these tasks until the Kuwaitis were prepared to assume these responsibilities.   As stated in the Statement of Work Section 1.0 Introduction:

"Upon contract award, the contractor will accomplish all of the CMS tasks and provide all of the CDRL[3]'s.  As specified by the KAF, KAF maintenance and material support personnel will be assigned to the contractor O [organizational] and I [intermediate] (including QA [quality assurance]) organizations, as CMS [contractor maintenance services] function trainees, until they are fully qualified to perform the CMS tasks cited herein…. Contractor personnel shall perform the tasks specified in this SOW [statement of work], in concert with KAF personnel. Over the duration of this contract, contractor personnel shall provide CMS function OJT [on the job training] to all assigned KAF personnel, since it is intended that the number of CMS assigned KAF personnel should increase each year as the KAF personnel become trained and qualified to perform the CMS functions, with a concurrent decrease in contractor personnel, until KAF self-sufficiency is attained."

19.     DynCorp had three main areas of contractual responsibility.  These were (1) DynCorp's duty to maintain the F/A-18s using its own personnel, in compliance with Kuwait Air Force standards for maintenance of the planes that are entirely consistent with the United States Navy F/A-18 maintenance directives, (2) DynCorp's quality assurance and accurate reporting responsibilities for the planes, and (3) DynCorp's duties for effective training of the Kuwait Air Force personnel to participate in and ultimately take charge of F/A-18 maintenance and quality assurance.  DynCorp's contractual duties concerning maintenance, quality assurance, accurate reporting, and maintenance

---

[3]     The acronym "CDRL" is a reference to the Contract Data Requirements List that was attached as an Exhibit to the Statement of Work.

8

personnel training are reflected in Statement of Work Section 3.0, entitled "Task Requirements."

20.   First, as to maintenance, the Statement of Work states:

3.1.  CONTRACTOR MAINTENANCE SERVICES.  The contractor shall augment KAF personnel in the performance of scheduled and unscheduled "O" [organizational] and "I" [intermediate] level CMS for the KAF F/A-18 C/D weapon system and equipment. F/A-18 C/D Systems to be supported include, but are not limited to: Avionics, Airframes, Power Plants, Aviation Life Support System (ALSS), and related Support Equipment (SE). The contractor shall maintain and repair KAF F/A-18 C/D Systems, Subsystems, Assemblies, Components, and Equipment items except for those Systems, Subsystems, Assemblies, Components, and Equipment items that are supported by a Repair of Repairables (ROR) contract. Further, the contractor shall provide all of the specified documentation that is associated with the SOW and the Exhibit A CDRLs.

*          *          *

3.1.4.  Contractor personnel shall perform the maintenance and repair of the KAF F/A-18 C/D weapon system's Common and Peculiar Support Equipment (CSE/PSE), as required.  The maintenance and repair of the KAF F/A-18 C/D Weapon System's associated Automatic Test Equipment (ATE) and the Test Program Set (TPS) hardware and software shall be, IAW [in accordance with] the procedures in the applicable ATE [automatic test equipment] and TPS [test program set] technical publications....

3.1.5.  CMS TASK DELIVERABLES.  The contractor shall conform to the Maintenance and Material Management program(s) referenced in the NAMP and comply with the reporting requirements cited below and in the Exhibit A CDRLs.

3.1.5.1.  The contractor shall provide a Monthly Maintenance Plan (MMP) (CDRL A001)

3.1.5.2.  The contractor shall provide a Daily Muster Report to document all of the assigned contractor personnel's availability to perform the "O" and "I" Level Maintenance, QA, OJT, and Supply Support tasks (CDRL A002)

9

False Claims Act Complaint

21.     Second, with respect to DynCorp's obligation to provide quality assurance services, the Statement of Work states as follows:

3.2  QUALITY ASSURANCE.  The contractor shall perform the QA of the maintenance support organizations, in support of the KAF F/A-18 C/D and equipment maintenance and support efforts IAW [in accordance with] this SOW [statement of work] and the Exhibit A CDRLs [contract data requirements list]. The contractor QA [quality assurance] functions shall consist of maintenance support activity program assessment, monitoring efforts, and providing reports on the maintenance support actions/processes.

3.2.1  QUALITY ASSURANCE (QA) TASK DELIVERABLES. The following KAF F/A-18 C/D and equipment programs shall be monitored and reported as cited below and in the Exhibit A CDRLs:

3.2.1.1.  Monthly Foreign Object Damage (FOD) Prevention Program Report (CDRL A003).

3.2.1.2.  Monthly Aircraft Fuel Surveillance Program Report (CDRL A004).

3.2.1.3.  Monthly Joint Oil Analysis Program (JOAP) Report (CDRL A005).

3.2.1.4.  Hydraulic Contamination Control Program Report (CDRL A006).

3.2.1.5.  Monthly Tool Control Program Report (CDRL A007).

3.2.1.6.  Monthly Egress System Checkout Program Report (CDRL A008).

3.2.1.7.  Monthly Explosives Handling Personnel Qualification/Certification Program Report (CDRL A009).

3.2.1.8.  Quarterly, the contractor shall provide W/C [work center] Audit Reports (CDRL A00A), which provide for the evaluation/status of the contractor CMS [contractor maintenance services] Activity efforts. Provisions shall also be made for recording CMS Activity W/C discrepancy

corrective actions. The following CMS W/C areas are to be evaluated and reported:

- Personnel and Skills.
- Technical Publications.
- Maintenance Instructions (MIs).
- Certification of Personnel
- Licensing of Personnel (i.e. Aircraft Taxi, Engine Run Up and SE Operators).
- Cleanliness and Condition of Spaces. Compliance with Fire and Safety Regulations.
- Configuration of Components, Equipment, Aircraft, and Accuracy of Associated Logs and Records and Accuracy of Aircraft, SE, Equipment and ALSS Logs and Records.
- Material Condition of Aircraft, SE, and Material.
- Validation of VIDS Boards and Operating Procedures.
- Availability, Use, and Calibration Status of SE.
- Compliance with FOD Prevention Programs.
- Adherence to Directives, Procedures, and Inspections.
- Adequacy and Availability of Process, Test, and Inspection Procedures.
- Schedule of the next quarter's audits

22.    Third, with respect to Dyncorp's obligation to train Kuwait Air Force personnel to maintain the aircraft and conduct quality assurance, the Statement of Work states:

3.3 CONTRACTOR SUPPORT SERVICES.  The primary purpose of the Contractor Support Services is to provide on-site proficiency training, technical guidance and information in the evaluation of unusual field problems and render technical guidance related specifically to the equipment cited in Paragraph 3.1 of the SOW [statement of work].  The objective of the support services is to elevate the technical skills and abilities of military and civilian personnel of the GOK responsible for the operation and maintenance of the system/equipment to the level of self-sufficiency.  Specific responsibilities are defined in task descriptions.

3.3.1  Provide on-site classroom and OJT [on the job training] to the GOK [government of Kuwait] military and civilian personnel on maintenance and operation techniques pertaining to adjustment, calibration, trouble-shooting, bench check, routine maintenance,

inspection, and repair of the assigned system/equipment, including related control equipment.

3.3.2  Provide guidance and instruction of the use of associated special tools and test equipment.

3.3.3  Devise local training course outlines, lesson plans and written examinations, including guidance to military and civilian personnel of the GOK in identifying needed training programs.

3.3.4  Emphasize safety precautions to be taken in all training provided.

3.3.5  Demonstrate best method of installing modifications, retrofit kits, etc.

3.3.6  Render technical guidance to resolve difficult and unusual maintenance problems.

3.3.7  Provide an analysis of maintenance difficulties and advise on the establishment of changes to maintenance, inspection and training programs designed to improve the quality of maintenance.

3.3.8  Provide a liaison through which technical information related to maintenance and operational problems available in the plant, can quickly be disseminated to military and civilian personnel of the GOK.

3.3.9  Provide a liaison through which information related to installation kit, check out procedures and related data problems can be quickly relayed to the plant for correction and/or resolution.

3.3.10  Provide guidance to maintenance personnel in preparing failure data reports and unsatisfactory reports.

3.3.11  OJT [on the job training] and Task Deliverables.  As directed by the COR [contracting officer's representative], the contractor shall accomplish the following tasks, in order to provide for a KAF Personnel OJT [on the job training] Program, which shall be capable of enhancing, refreshing, and/or providing practical applications of the formal classroom training received, by contractor personnel, from the U.S. Navy, another service, or contractors.  All OJT [on the

job training] reports shall be provided IAW [in accordance with] the Exhibit A CDRLs [contract data requirements list].

    3.3.11.1.  The contractor shall analyze the training required by KAF personnel and develop a training plan for each KAF individual that is scheduled for CMS [contractor maintenance services] contractor OJT [on the job training] by the KAF.

-   Monthly Training Syllabus Plan Report: Documents the training syllabus required by each individual identified by the KAF to enter the OJT program each year and identifies the projected date that the KAF personnel are ready to occupy a functional CMS maintenance billet  (CDRL A00B).

    3.3.11.2.  The contractor shall prepare and provide the following report:

-   Monthly Training Plan Report: Documents, through updates, a comparison of the KAF personnel's in-progress OJT status to the planned KAF maintenance personnel billet requirements (CDRL A00C).

    3.3.11.3.  Upon completion of the Training Syllabus Plan Report, the contractor shall provide the completed KAF personnel's Training Folder Reports (CDRL A00D), which shall be used to nominate each KAF trainee for a maintenance qualification and/or certification by the KAF.

3.3.12  The contractor shall provide Instructors to conduct KAF training classes and assist the KAF Instructors.  The instructors will teach maintenance training and conduct classes in Kuwait. The instructors will assist the KAF in performing the following tasks:

- Update and provide KAF F/A-18 C/D Familiarization Courses
- Teach structured flight line hands-on training, as required by the KAF
- Provide training on KAF unique airborne and support equipment and upgrade/modifications to maintenance courseware for such equipment
- The contractor instructors will use the developed Instructor/Lesson Guides, Student Training Course Guides,

13

Audio Visual Aids, Video Tapes, Wall Charts, and Test for Measurement of Student Achievement. The contractor will teach the KAF Maintenance Training for KAF F/A-18 C/D current OFPs (CDRL A00E).

23.     The introductory paragraph 1.0 of the Statement of Work further clarifies the ultimate goal of the training was to achieve Kuwaiti self-sufficiency in maintaining the F/A-18s.. The introduction specifically states: "Over the duration of this contract, contractor personnel shall provide CMS function OJT to all assigned KAF personnel, since it is intended that the number of CMS assigned KAF personnel should increase each year as the KAF personnel become trained and qualified to perform the CMS functions, with a concurrent decrease in contractor personnel, until KAF self-sufficiency is attained."  It is clear from the nature of DynCorp's ongoing performance that DynCorp was not performing its contractual obligations in training Kuwaiti personnel, and that self-sufficiency would never be achieved under DynCorp's watch. Apparently, it was in DynCorp's best interest for the KAF to never reach self-sufficiency. To deflect criticisms for its failure to meet this important contractual requirement and create a "culture of plausible denial," DynCorp senior managers manufactured excuses to blame KAF maintenance personnel. Nonetheless, KAF personnel were ready, willing and able to accept the training DynCorp was contracted to provide.

24.     As further alleged below, the Quality Assurance Audits the Relator obtained reflect that DynCorp was not performing its training duties under the contract.

14

1    As of the dates of those reports, only a negligible number of KAF maintenance

2    personnel had been trained and certified as being qualified in key billets.

3
4    **BACKGROUND OF THE RELATOR'S INVESTIGATION OF
     DYNCORP'S CONTRACTUAL PERFORMANCE**

5
6    25.      Relator was hired by DynCorp to serve as Command Staff Advisor

7    to the Commanding General of the Kuwait Air Force, General Al Otaebi, in

8    connection with DynCorp's contract with the United States pertaining to the F/A-

9    18s sold to Kuwait by U.S. defense manufacturer Boeing.  The DynCorp contract

10   was part of a group of contracts related to maintenance and support for the KAF

11
12   F/A-18s[4].  DynCorp's contract related solely to maintenance of the planes. Under

13   that contract, DynCorp undertook the obligation to train the Kuwaiti personnel to

14
15   maintain the F/A-18s, and DynCorp further had the duty to maintain the F/A-18s

---

16   [4] As reported in the Defense Industry Daily on August 25, 2005, "The U.S.

17   Defense Security Cooperation Agency recently notified Congress of a possible
     Foreign Military Sale of continuing logistics support, contractor maintenance,

18   and technical services, and associated equipment and services in support of
     Kuwait's 40 F/A-18C&D aircraft. The total value, if all options are exercised,

19   could be as high as $295 million.

20

21   Kuwait has traditionally relied heavily on outside support to maintain its
     modern military equipment, which includes F/A-18 aircraft, M1A1 Abrams

22   tanks, et. al. These contractor services will provide for a continuation of the
     required logistics and support through CY 2011. The principal contractors

23   participating in this proposed sale are DYNCORP of Fort Worth, TX; F/A-18

24   manufacturer The Boeing Company of St. Louis, MO; and Anteon Corporation
     of Fairfax, VA. Implementation of this proposed sale will require the assignment

25   of 50 contractor representatives in Kuwait to maintain continuity in the program

26   support through CY 2011. There are no known offset agreements proposed in
     connection with this potential sale."

27

28                                   15

     False Claims Act Complaint

with its own personnel to the extent that the Kuwaitis did not perform the required maintenance.

26.     Proper aircraft maintenance is essential and can be a matter of life or death for the pilots who fly the planes, maintenance and other personnel working around the planes, and other personnel on the ground or in the air who might be involved if there is an aircraft mishap. Therefore, strict standards are well defined and must be adhered to. Specifically, with respect to the F/A-18s sold to the Kuwait Air Force, DynCorp was contractually obligated to conduct maintenance operations in accordance with the standards set forth in Navy Manual 4790. This manual, including its maintenance standards, was incorporated into DynCorp's contract with the Government. Although called a "manual" for purposes of this complaint, the 4790 is actually an "instruction" or "command," as reflected in its formal title, "Navy Aviation Maintenance Program (NAMP) Instruction."

27.     Relator arrived in Kuwait at the commencement of his employment with DynCorp on or about April 7, 2007, and worked there for DynCorp for approximately six months.  After Relator's arrival, he was inbriefed by Robert "Bob" Hahn.  Hahn, as DynCorp program officer, was the manager of DynCorp's operations in Kuwait. Hahn also served in the capacity of CMS F/A-18 maintenance officer, with defined responsibilities under the 4790 Manual paragraph 3.5.3.  As such, he was responsible or instituting and overseeing the maintenance program for the KAF F/A-18 planes.

16

28.     For example, the Statement of Work, paragraph 3.1.5.1 provides that "the contractor shall provide a Monthly Maintenance Plan (MMP)…"   The 4790 manual paragraph 3.3.4.1 specifies that "The purpose of the MMP is to provide scheduled control of the predictable maintenance workload, for example, inspections, transfer or receipt of aircraft, and compliance with TDs. By scheduling predictable maintenance, the capability for accomplishing unscheduled work can be determined. In addition, requirements for SE, material, manpower, and other factors affecting the maintenance operation can be determined in advance of actual need."   The required components of the monthly plan are also listed in the manual.  The 4790 manual paragraph 3.3.4.2 provides that "[a] monthly maintenance planning meeting will be convened by theI-level MO [maintenance officer][5] to coordinate and improve the overall maintenance program. Maintenance and supply representatives from all supported activities on board including weapons departments shall attend." (See, also, 3.5.3.5). These,

[5]   "The NAMP is founded upon the three-level maintenance concept and is the authority governing management of O-level, I-level, and D-level aviation maintenance….O-level maintenance is performed by an operating unit on a day-to-day basis in support of its own operations. The O-level maintenance mission is to maintain assigned aircraft and aeronautical equipment in a full mission capable status while continually improving the local maintenance process…. O-level maintenance is usually accomplished by maintenance personnel assigned to aircraft reporting custodians."   "I-level" (intermediate level) is the lowest organizational level which has its own maintenance organization. The organization at Al-Jaber Air Force Base performed a combination of I-level functions and functions relegated to "O-Level", the next highest level. Manual 4790 paragraphs 3.1.1-3.1.1.1. The term "maintenance officer" is explained at 4790 manual paragraph 3.5.2.-3.5.3.

17

False Claims Act Complaint

and a number of other critical tasks the 4790 directs, are functions DynCorp was required to provide as part of its regular maintenance responsibilities for the KAF F/A-18s at Al Jaber Air Force Base.

29.     Although Hahn was Relator's boss within the DynCorp corporate hierarchy, Relator's primary job duties consisted of helping the KAF Commanding General and following his instructions.  The job required Relator to report directly to Major General Al Otaebi. Relator's office was near Al Otaebi's office in the KAF Command Headquarters building located at the Kuwait international airport.  Hahn's office was separate, located at a villa rented by DynCorp.  During his employment with DynCorp, Relator saw Hahn on average one to five times per week. Relator reported to General Al Otaebi each day.

30.     General Al Otaebi asked Relator to "be his eyes and ears" with respect to the DynCorp F/A-18 maintenance contract, since he stated he felt he was not adequately being kept informed about DynCorp's performance. During the Relator's first meeting with the KAF Commanding General, he was directed by General Al Otaebi to "find out what's going on with the F/A-18 maintenance" and report back the findings. Initially, Relator began conducting informal F/A-18 flight line, work center, and flight operations inspections to observe DynCorp performing and complying with its contractual duties. Relator was surprised, and then shocked, by what he found during these inspections.

False Claims Act Complaint

31.     Relator was capable and well prepared to conduct this investigation. Relator had the experience to observe and evaluate the maintenance activity for the F/A-18s, since he had previously served as an F/A-18 pilot, and maintenance Quality Assurance Officer (QAO).  Additionally, Relater previously served as an Aviation Safety Officer (ASO) for two squadrons—one for the U.S. Marine Corps (VMFA-312) and the other for the U.S. Navy (VFA-27). Also, Relator knew many of the Kuwaiti pilots assigned to the KAF F/A-18 squadrons, since he had previously served as an F/A-18 instructor pilot (IP) for McDonnell Douglas Training Systems (MDTS). In this prior IP role, during 1995 and 1996, Relator participated in training KAF pilots.  In fact, General Khamis, the Commanding General of Al Jaber Air Base as of 2007, had been trained by Relator during 1995 and 1996. They were longstanding acquaintances.

**THE RESULTS OF RELATOR'S INVESTIGATION ESTABLISH THAT DYNCORP FAILED TO PROVIDE THE SERVICES REQUIRED UNDER THE CONTRACT**

32.     Relator's investigation uncovered that DynCorp was failing to perform its contract. This failure to perform was reflected in the following deficiencies that equate to material absence of delivery of services.

33.     First, failing quality assurance audits (i.e. inspections).  Relator met with the chief quality assurance ("QA") inspector of DynCorp.  Over a period of months, in 4-6 different meetings, he provided Relator with reports, called quality assurance audits. These audits showed that the work centers, where the F/A-18s

·19

are taken for maintenance work, had repeatedly failed their inspection audits over time.

34.     The Navy's Quality Assurance program is designed for the purpose of prevention of equipment failure, which in the case of aircraft can have catastrophic results including bodily injury and death.  As stated in the current version of Navy Manual 4790, paragraph 7.1.3, "The QA concept is fundamentally the prevention of the occurrence of defects.  The concept embraces all events from the start of the maintenance operation to its completion and is the responsibility of all maintenance personnel."  Paragraph 7.1.4 states that "The achievement of QA depends on prevention, knowledge and special skills. The principle of prevention if that it is necessary to preclude maintenance failure. This principle extends to safety of personnel, maintenance of equipment, and virtually every aspect of the total maintenance effort.  Prevention is about regulation events rather than being regulated by them."

35.     According to the Navy Manual 4790, relating to this maintenance and stipulated in Kuwait's contract with the United States Navy as the governing documents, each of these shops must be inspected at regular, specified, intervals. These inspections, which include a checklist of items to be scrutinized and reported upon, are designed to ensure that each shop is conducting maintenance according to requirements. The audits include inspection checklists for ensuring that critical procedures, such as checking maintenance logs, training personnel in

20

each shop, and maintaining current, up-to-date maintenance manuals and related technical publications, are meeting minimum standards.

36.     The inspection teams are composed of QA reps. The Kuwait Air Force and DynCorp had adjoining but separate QA offices related to the F/A-18 project, with separate groups of QA reps for each.  Although the Kuwait Air Force's QA reps were, at a minimum, supposed to conduct their own inspections and write the reports, DynCorp QA representatives performed this task. This was due to DynCorp's failure to adequately train, notify and involve the KAF QA personnel.  DynCorp's contractual role is to perform as the expert on F/A-18s. Consequently, the company bears the responsibility to secure proper performance pursuant to the letter and spirit of Navy Manual 4790.

37.     There are a number of "organizational level" (squadron level) work centers, specialized by function, located at Al Jaber AFB. These "shops" are where the F/A-18s are maintained.  For example, the "powerplant" shop, which had 10-12 assigned personnel, conducted maintenance of the F/A-18 engines.

38.     Each QA audit of each separate work center generates a document reflecting that the inspection was conducted and its results. Each of the quality assurance audits consists of one or more of these documents.

39.     The QA audits reflect a general failure of DynCorp to perform its contract.  Summaries of these reports are attached as Exhibits A through J.

False Claims Act Complaint

Exhibits "A", "C", "D," "G," "I" and "J" document work centers to be "unsatisfactory." [6]

40.    There were three reports that were stated to be "satisfactory" but these were all re-audits of prior unsatisfactory results.  Exhibit "A" was reaudited as reflected in Exhibit "H," Exhibit "B" was re-audited as reflected in Exhibit "F," and Exhibit "C" was re-audited as reflected in Exhibit "E".  Although the re-audits were denominated as "satisfactory" (vs. the original "unsatisfactory" grade), in two of the three (Exhibits "E" and "F"), the results were actually the same or worse than in the first audits.

41.    Also, in two of the three (Exhibits "F" and "H"), the way the re-audits were conducted to achieve a passing grade was blatantly improper. As noted in the reports, corrections of unsatisfactory conditions were made "on the spot" at the time of the audits.  In another report (Exhibit "I"), three out of the six work centers were found to be unsatisfactory, and three were found to be satisfactory.

42.    Moreover, with the single exception of the Intermediate Maintenance Ground Support Equipment 900 Division, the other audits exhibit a percentage of "yes" (acceptable) evaluations that is woefully low.  See Exhibit "A" (45% yes, 55% no), Exhibit "B" (90% yes, 10% no), Exhibit "C" (62% yes,

---

[6]    See p. 2 of the reports: Exhibits, "A", "C" and "D" and p. 1 of Exhibit "H"

22

28% no), Exhibit "D" (44% yes, 56% no), Exhibit "E" (69% yes, 31% no), Exhibit "F" (82% yes, 18% no), Exhibit "G" (69% yes, 34% no), Exhibit "H " (86% yes, 14% no), Exhibit "I" (65% yes, 35% no), and Exhibit "J" (59% yes, 41% no). In a comparable audit at a U.S. base for the F/A-18s, the percentage of "no" responses would be very low—in some cases, zero. There is no margin for error in the maintenance of these complex and expensive machines, and no room to fudge the results. Even a 5% "no" rate is unacceptable, according to the Relator's knowledge and experience of the applicable standards for F/A-18 maintenance and quality assurance.

43. The Kuwait Air Force shops for the F/A-18s failed their inspections for highly material reasons. These are reflected in comments for each quality assurance audit report.

44. The failure to pass inspection is an independent basis for concluding that DynCorp did not perform the duties required by its contract with the Government. DynCorp's job was to conduct proper maintenance, including keeping maintenance shops in compliance with applicable standards. Inspection of the shops is considered the key to ensuring that the planes themselves are in satisfactory condition for flight. The underlying philosophy behind this, "inspect the shops to ascertain if aircraft are being maintained properly," is that inspecting the planes themselves or inspecting personnel maintaining the planes will enable personnel subject to inspection to put their best foot forward on the day of the

23

False Claims Act Complaint

inspection, regardless of overall quality of their ongoing (when inspectors are not present) maintenance practices. Whereas, the condition of the shops is evidence of the ongoing maintenance practices in place at a specific base location. Moreover, the inspection checklists are relatively easy to pass.

45.      Manual 4790 states that "The QA Audit Program establishes policy, responsibilities, and requirements for evaluating performance throughout the Maintenance Department" (paragraph 10.7.1) and that "[a]udits serve as an orderly method of identifying, investigating, and correcting deficiencies on a scheduled and unscheduled basis" (paragraph 10.7.2.1), and further provides that "[t]he QA Division is charged with managing a comprehensive audit program that encompasses all programs managed and monitored per this instruction." (paragraph 10.7.2.2).  Under manual 4790, paragraph 10.7.4.1, the work center audits had to be performed semiannually.  However, this was not consistently the case.   In Relator's experience, the failure of DynCorp F/A-18 maintenance Work Centers at Al Jaber Air Force Base to pass quality assurance audits (i.e. inspections) signifies that, under prevailing Government standards that are applicable to the KAF F/A-18s under U.S. government contracts, the F/A-18 aircraft should not have been flying. The entire operation should have been shut down until the deficiencies identified in the inspection reports were corrected. DynCorp, as the party in charge of the F/A-18 project, should have been the party insistent on shutting down the operations. Instead, DynCorp conducted a

24

minimum number of required inspections. Despite the poor conditions revealed by the audits that should have mandated repeat preparation and inspection of Work Centers, no action was taken by Hahn.[7] Additionally, DynCorp failed to notify KAF and U.S. personnel of these failures. Worse yet, DynCorp participated in blocking the audits from reaching the Ahmed Al Jaber air base Commanding General and the KAF Commanding General. Instead of appropriately communicating the failures, DynCorp hid the failures and fired anyone who attempted to take appropriate corrective action.

46.     The failure to pass QA audits was coupled with the complete failure of DynCorp to take corrective action to address the violations uncovered by the audits.  According to the current version of manual 4790, paragraph 10.7.3.2.c, the maintenance officer shall, "ensure corrective action and QA follow-up on discrepant areas are performed within a reasonable time frame (normally 10 working days) and that the corrective action is adequate."

47.     Moreover, the quality assurance audit inspections were themselves fundamentally flawed in that DynCorp personnel were inspecting DynCorp's

---

[7] The 4790 manual, paragraph 5.1.1.5.1, provides: "Scheduled maintenance requirements are the minimum necessary under all conditions and are mandatory to ensure timely discovery and correction of defects. Reporting custodians may increase the depth or frequency of any scheduled inspection or may require additional inspections whenever excessive flight or calendar time has elapsed between inspections, or environmental or operational conditions are considered to have impaired the material reliability or integrity of the equipment."

25

False Claims Act Complaint

own performance, thereby creating an inherent conflict of interest on the part of the inspectors. In Relator's experience, a quality assurance program needs to be audited periodically by inspectors outside the unit who are performing the maintenance. This is also reflected in the 4790 manual.[8]

48.     There is a ready alternative in that the U.S. Navy would make its inspection team, known as the Aviation Maintenance Management Team, available to the Kuwait Air Force to inspect the maintenance at Al Jaber. This was done for DynCorp's immediate predecessor for the Al Jaber F/A-18 maintenance contract, Kay and Company, as reflected in the January 25, 1997 memo referenced elsewhere in this complaint. The memo states that its subject is "Aviation Maintenance Management Team (AMMT) Review of the F/A-18 Maintenance program at Al-Jaber Base." According to the 4790 manual, AMMT inspections are required for government contractors performing maintenance, as well as, for government maintenance programs. The AMMT inspectors are fully prepared to extend inspection services to outside facilities such as Al Jaber[9].

---

[8]     Chapter 10 of the 4790 states: "NOTE: For reasons of objectivity and impartiality, a common practice is for QA-related work center audits (any work center which begins with the numbers 04) to be conducted by knowledgeable individuals not assigned to that QA work center's division. While not a requirement, this practice provides QA managers with an unbiased perspective of their division they would not otherwise have access to."

[9] The 4790 manual provides: "11.1.5.4 Aviation Maintenance Management Teams (AMMT).... AMMTs evaluate performance of maintenance activities, train, support, and assist in improving performance in aviation maintenance and logistics support processes and procedures....AMMTs are

49.     Second, failure to train Kuwait Air Force personnel to perform maintenance for the F/A-18s.  DynCorp and KAF personnel were assigned to each of the shops. If the Kuwaitis failed to perform, DynCorp personnel were contractually required to maintain the F/A-18s per 4790 standards by properly managing the applicable operations and tasks within each of the work centers. Relator observed that instead of training the Kuwaiti's according to contract, DynCorp personnel performed the maintenance tasks themselves. Doing the maintenance themselves, DynCorp personnel ensured KAF maintainers would continue to be dependent on them for ongoing maintenance. Also, doing the work themselves required less work for DynCorp employees. If DynCorp personnel were to ensure KAF personnel performed worked to the required standards, it would have meant DynCorp personnel would have to actually train and supervise Kuwaiti personnel. It was much easier and more lucrative for DynCorp managers and employees to ignore the KAF maintenance personnel.

50.     The attached quality assurance audit reports reflect the fact that DynCorp was failing to train Kuwait Air Force personnel.  Quality assurance work can only be conducted by personnel who have been properly trained and have thereby attained a rating allowing them to work in quality assurance.  Each

responsible for evaluating the maintenance programs of the aircraft custodians under their cognizance. While the evaluation criteria may change based on the contract, the requirement for AMMT inspections apply to all Aircraft Reporting Custodians regardless of whether the aircraft are being maintained by military personnel, government civil service, or contract maintenance…"

False Claims Act Complaint

of the quality assurance audits lists the number of Kuwait Air Force personnel who were rated to do quality assurance work at each Work Center. At many of the F/A-18 maintenance shops, there were no properly trained and qualified KAF personnel.

51.    Third, failure of DynCorp to conduct proper maintenance according to the Navy Manual standards.  Another material failure of DynCorp was that its personnel, in performing the maintenance of the F/A-18s themselves (rather than KAF personnel), failed to perform by not attempting to maintain the planes according to the standards of the applicable U.S. Navy Manual 4790. These standards were incorporated by reference into DynCorp's contract.  Instead, DynCorp personnel barely did the minimum work necessary to keep the F/A-18s operational (although not in compliance with the mandatory standards). Relator observed several dozen times, as he did inspections of the work centers and flight line operations, that only an estimated 20% of the DynCorp personnel assigned to the shops were actually doing work.

52.    The remaining DynCorp employees were either surfing the Internet or playing computer games. Over 20 DynCorp personnel openly bragged about being able to "spend most of the day on the computer surfing the Web or playing computer games." The failure to actually work was an established and management-approved norm.  Bob Hahn joked about personnel spending most of the work hours "goofing off" and did nothing to address it. Additionally, Relator

False Claims Act Complaint

occasionally observed that some of the DynCorp work centers were like "ghost towns"—empty of all DynCorp personnel. This was instead of being bustling with activity, as is normally the case when an F/A-18 maintenance shop is functioning properly. Ironically, some number of KAF maintenance personnel were nearly always in the adjacent KAF work spaces. These observations were made over the course of Relator's employment, as he walked through the shops at Al Jaber Air Base at least 30 times during the course of his investigation.

53.     Fourth, an additional failure of DynCorp was that the F/A-18 planes were not being "buttoned up" at night.  Securing the aircraft usually requires 5-15 minutes. It is an essential daily maintenance task for each plane at the end of a flight. If not completed post-flight, it must be completed at the end the flying day. Securing the aircraft primarily consists of putting covers over several key areas— such as the engine intakes, engine exhausts, angle of attack (AOA) probes, and other equipment. This simple practice prevents the accumulation of dust and other "foreign object damage" (FOD) in critical areas of the F/A-18.

54.     As with the rest of the maintenance tasks, as alleged above, it was DynCorp's responsibility to directly undertake the maintenance task of buttoning up the planes if KAF personnel weren't doing so. However, DynCorp consistently failed to perform this easy task.  Relator personally learned of this non-performance by DynCorp from both Boeing instructor pilots and when he "toured the flight line" (i.e., inspected the F/A-18s on the KAF flight line). As

29

False Claims Act Complaint

part of his ongoing inspection of the F/A-18 maintenance program, Relator walked the flight line approximately 1-6 times per week. Roughly half of these walk-throughs occurred after the completion of daily flight operations. During Relator's walk-throughs of the flight line, only a handful (4-6) of times were 100% of the aircraft properly secured and covered. The engine intake and exhaust covers, and/or the AOA probe covers were occasionally not installed.

55.     Because of Kuwait's geography, buttoning up the F/A-18 planes on a daily basis is essential to prevent sand from entering the engine and impairing its performance.  This task, although relatively simple, can be a matter of life and death.  Shortly after arriving at his job in Kuwait for DynCorp, Relator learned that a KAF F/A-18 had crashed because the AOA probe was sticking due to dust. As a result of this sticking, the AOA probe failed to provide the KAF pilot with proper angle-of-attack indications and slow speed flight warning. This resulted in the pilot flying too slow, which eventually caused the aircraft to stall at a low altitude. The KAF pilot recognized he had insufficient altitude to recover from the stall, and ejected. The pilot died after impacting the ground. After ejection, his parachute caught fire due to the explosion and fireball from the crashed F/A-18. This was a completely preventable mishap—if DynCorp had been ensuring the AOA probes were properly covered between flights and at the end of the day.

56.     Fifth, DynCorp failed to safely maintain the ordinance on the KAF Al Jaber air base.   According to the US Navy's manual there are rules for the

30

handling of ordinance, including bombs, missiles and cannon ammunition. This ordinance is held in shelters on the base, and it is supposed to be pinned down on an ordinance carrier. Also, live ordinance carriers are supposed to be stored away from other ordinance carriers by a specified number of feet, to reduce the possibility of a chain reaction of explosions. Relator personally observed this wasn't being done. Each time Relator toured the ordnance areas, live ordnance was not properly pinned to carriers, and live warheads were stored directly next to each other in a haphazard manner.

57. In addition to these failures, another safety hazard existed. Of the aircraft fire extinguishers posted on the KAF flight line, nearly 20% were unserviceable. DynCorp management ignored this, despite several dozen new fire extinguishers being located in a warehouse at Al Jaber air base. Despite Relator's repeated requests to have fire extinguishers serviced or replaced, no action was taken by DynCorp.

58. Defendant knowingly committed its violations as reflected in its knowledge of the inspection reports and of DynCorp's failure to perform. Mike Taylor, of the Office of Military Cooperation-Kuwait, was an independent contractor and lead liaison for the Navy in Kuwait. The liaison services were provided under the Office of Military Cooperation-Kuwait, which operated out of the U.S. Embassy in Kuwait under Brigadier General Charles L. Hudson. Taylor learned about Relator's efforts to inspect the aircraft maintenance. Shortly after

31

Relator arrived in Kuwait and began his inspections, Mike called Relator into his office and provided him with a document dated January 25, 1997. This was a memo from the Director, Air Force Readiness Branch, Kuwait to the Commander, Kuwait Air Force, with the subject line: "Aviation Maintenance Team (AMMT) Review of the F/A-18 Maintenance Program at Al-Jaber Base. Mike advised Relator that the unacceptable maintenance operations in 2007 for the F/A-18s at Al Jaber were in the same state as they were in 1997 as reflected in that memo.

59.     The January 25, 1997 memo's cover letter stated:

"Enclosures (1) and (2) are the results of the AMMT performed on the F/A-18 Maintenance program last November.  It lists some critical shortfalls, however, please note that improvement of this program is the goal of this inspection. The aim is to promote a standardized maintenance procedure and the level of effort that best supports the F/A-18 maintenance requirements."

60.     One of the enclosures, entitled "Aviation Maintenance Team (AMMT) review of the F/A-18 Maintenance program at Al-Jaber Base, Kuwait, conformed that the relevant guidelines were in the 4790 manual.  The memo states that "The findings and recommendations are the result of comparing KAF maintenance procedure the requirements of reference (a)..." and reference (a) is identified as "OPNAVINST 4790.2F, Naval Aviation Maintenance Program", which was the 4790 standard Navy Manual in effect at that time for aircraft

False Claims Act Complaint

maintenance.  This memo listed twelve items under the heading "The following areas or programs were viewed as having major discrepancies that require immediate corrective action with ongoing management attention."

61.    The second enclosure was a memo entitled "Kuwait Air Force", dated November 20, 1996, which reviewed the shortfalls of specific work centers for the F/A-18 maintenance program.  This memo attempted to blame the Kuwaitis, stating that "when entering most work centers, it was noted that contactor personnel were in work on various jobs and that KAF personnel, if any were present were sitting the office or sleeping.  More often than not when asked who was the Kuwaiti in charge of the workcenter, the answer was he is not here today.  When a supervisor was identified and asked to explain how a program worked they were hesitant and unsure, quickly deferring to the contractor leadman.  The contractor's job is to mentor and assist the Kuwaitis' in F/A-18 maintenance and management procedures, with the goal of self-sufficiency for the Kuwaitis.  The way the Kuwait military is currently operating, this goal will not be attained."

62.    The January 25, 1997 memo attempted to blame the Kuwaitis for the severe shortfalls in F/A-18 maintenance.  However, Relator knew that under DynCorp's contract, DynCorp was required to perform maintenance up to appropriate U.S. standards -- even if KAF personnel weren't ready, willing or able to do so.  Moreover, during Relator's numerous walk-throughs at Al Jaber

33

air base in 2007, he personally observed KAF personnel present. During conversations with Kuwaiti maintenance personnel, they articulated they were being ignored by DynCorp CMS personnel. In Relator's prior Instructor Pilot experience during 1995 and 1996, he had observed the Kuwait Air Force maintenance personnel present and working on the F/A-18s. During both periods of time (1995/1996 & 2007), Relator chatted with KAF maintenance personnel. Based on both sets of experiences, Relator observed a profound difference between 1995/1996 and 2007 in the level that KAF personnel were being engaged to do work. While they were actively engaged in a good portion of the work during 1995/1996, they were far less involved during 2007. In 1995/1996, there was clearly an effort being exerted by Kay and Associates to actively engage and train the KAF maintenance personnel.

63.     Independent of Relator's investigation, Navy Lieutenant Commander (LCDR) Gustafson, whose official title was F/A-18 Maintenance/Logistics Advisor, sought out Relator to speak with him about the F/A-18 maintenance. LCDR Gustafson provided Navy liaison services for, among other programs, the DynCorp F/A-18 program.  The liaison services were provided under the Office of Military Cooperation-Kuwait, which operated out of the U.S. Embassy in Kuwait under Brigadier General Charles L. Hudson. After their initial introduction, Relator and LCDR Gustafson continued discuss bringing KAF F/A-18 aircraft maintenance up to minimum standards.

34

64.     Relator spoke to LCDR Gustafson about the January 25, 1997 document and enclosures.  LCDR Gustafson expressed agreement with Relator that F/A-18 maintenance is to be performed by DynCorp if the Kuwaitis are falling short of the applicable requirements.

65.     Without a request or any prompting from the Relator, LCDR Gustafson asked Relator to meet with the DynCorp Quality Assurance chief at Al Jaber AFB. LCDR Gustafson scheduled the meeting and drove Relator to the base in his Navy supplied vehicle. In subsequent weeks, Relator learned the QA chief, who worked as a DynCorp employee under Bob Hahn, was also motivated to improve KAF F/A-18 maintenance.  During the first meeting at Al Jaber air base that LCDR Gustafson arranged, Relator met with the QA chief for five minutes—when Bob Hahn walked up and interrupted the meeting. Relator met with that same individual four to five additional times.  In those meetings, the Quality Assurance chief provided Relator with copies of the Quality Assurance reports (and this was Relator's exclusive source for the reports).

66.     Soon after learning of the failed QA audits, Relator requested an appointment to speak with Bob Hahn.  Relator raised the subject of the reports. Hahn admitted getting the audit reports reflecting the failed inspections. Hahn also had knowledge of the poor maintenance of the F/A-18s. He openly admitted "fudging" the Daily Maintenance Reports in the Maintenance Control office. These list aircraft that are "up", i.e. "FMC" (fully mission capable) and ready to

35

be flown. From the Relator's walk-through inspections and discussions with DynCorp and KAF maintenance personnel, of the 37 F/A-18s at the air base, less than 50% were FMC at any given time. Hahn acknowledged the "reports were being fudged" to reflect better results.

67.     At the conclusion of this meeting, Hahn told Relator in no uncertain terms not to talk to General Al Oteibi about the F/A-18s maintenance problems.. When Relator suggested to Bob Hahn that, "we [DynCorp] are contractually obligated to perform the maintenance to the 4790 standards if the Kuwaiti's aren't doing so," Hahn told the Relator, "we [DynCorp] are not going to do that." Hahn further told the Relator, "'we' are not going to take any action regarding the failed reports." Hahn also told Relator not to tell his Kuwaiti boss, General Al Oteibi, about the failed maintenance reports or about the true F/A-18 daily FMC status. Hahn also offered Relator an unspecified threat, stating, "you know who writes your paycheck." Hahn's obstruction evidences DynCorp's purpose and intent to deceive both Kuwait and ultimately the U.S. government who would be notified by Kuwait and held responsible to Kuwait for DynCorp's failure to perform its contract.

68.     When asked by Relator, "Why don't we just simply fix this? It's easy to address." Hahn's response was, "the Kuwaitis don't show up for work and don't care, if we were to do more extensive maintenance and training the Kuwaitis would do nothing with it, we (DynCorp) are not being paid enough and

36

don't have enough personnel to do the KAF's job for them, and it doesn't matter because the Kuwait Air Force is never going to be in combat anyway."

69.     Hahn also told Relator he would investigate why the quality assurance audit reports were not making their way to General Al Oteibi as was expected.

70.     Hahn's assertion that he would "investigate" was apparently his way of deterring Relator from looking into this.  The audit reports were supposed to go from the Kuwaiti Maintenance Officer to General Al Khamis, the Commanding General of the Al Jaber Air Base (AAJB). General Al Khamis was then supposed to pass these reports to General Al Otaebi.  LCDR Gustafson told Relator the audit reports were going to the Kuwaiti colonel who was the head of the Kuwait F/A-18 Maintenance Office, a colonel equivalent in functional rank to Bob Hahn. The reports were disappearing in that office.  This information from LCDR Gustafson was correlated with Relator's investigation, since when Relator met with the Kuwaiti colonel, he admitted knowledge of the reports, whereas General Khamis denied ever seeing the reports.  Also, the DynCorp QA chief who gave Relator the audit reports advised Relator that Bob Hahn and the Kuwaiti colonel had an agreement these reports would not proceed among the Kuwaitis beyond the colonel's office. The QA chief stated he was also providing Bob Hahn with copies of the audits.

False Claims Act Complaint

71. Several days after the meeting between Relator and Hahn, Relator met jointly with Hahn and Mike Taylor in Mike's office and Relator again asked the question of, "why don't we (DynCorp) fix this?" Relator was given the same responses jointly by Hahn and Mike Taylor.

72. By his own admission, Hahn was aware of the lack of readiness of the Kuwaiti F/A-18s. During a visit the Relator made to Al Jaber air base in early May 2007—before LCDR Gustafson introduced Relator to the DynCorp QA chief, and before Relator explained his concerns based on his investigation to Hahn—Hahn introduced Relator to the DynCorp personnel working in the "maintenance control" office. Hahn handed Relator a copy of the latest Monthly Maintenance Report for the F/A-18 maintenance program (May 2007). Hahn openly said to Relator, flippantly, with several other DynCorp personnel within earshot in the maintenance control office, "Don't believe everything you read in there."

73. Relator also discovered that Hahn's daily maintenance report, indicating the "up status" (i.e. readiness) of the F/A-18s was grossly falsified on an ongoing basis. Relator learned this from multiple DynCorp personnel at Al Jaber AFB. Therefore, Hahn was deceiving the Navy liaison office and the Kuwait Air Force through these reports.

74. LCDR Gustafson informed Relator he had told Mike Taylor (who stated he was Hahn's personal friend), about Relator's attempts to address the

F/A-18 maintenance problem. LCDR Gustafson went on to tell Relator that Taylor was aware of the ongoing string of failed inspection reports, although he never received copies of them.  Over the course of his time in Kuwait, Relator had 10-15 meetings with both Hahn and Mike Taylor in Taylor's office. Three to four of these meetings resulted in discussions about the poor F/A-18 maintenance and audit results.  Hahn and Mike did the talking in these meetings.  A recurring theme was Hahn stating the reasons the inspection reports were failed was the Kuwaitis were not showing up for the training, and therefore this one area guaranteed the inspections would be failed. However, Relator learned this was false. KAF maintenance personnel were required to be at work at AAJB and many were.  Mike was aware Hahn was blaming the Kuwaitis and accepted it. Mike subsequently helped DynCorp to keep the reports under wraps by prohibiting Relator from being around Navy contract representatives when they arrived in Kuwait 2-3 months later for purposes of contract negotiation with DynCorp for the annual one-year extension of the contract.  Relator was subsequently advised by LCDR Gustafson that DynCorp falsified information about its performance in Kuwait in its talks with the Navy. DynCorp did this to induce the Navy to provide the next contract extension.

75.     Relator was also approached by Glenn Rogers, the Boeing Chief Pilot for KAF pilot training in Kuwait, regarding the quality of DynCorp F/A-18 maintenance for the KAF. Rogers provided Relator with a copy of his report and

False Claims Act Complaint

proposal regarding KAF pilot combat readiness and safety. In his report, titled "Pilot Training and Readiness Observations and Recommendation," Rogers states on page 6, "As can be seen from table 3 the average daily sortie rate was for 2006 was only 16.5…" He also states, "The average daily sortie rate required to achieve the minimum flight hours per year of 8400 would be 35 sorties per day." This is at least a 100% increase in the 2006 sortie rate provided by the available F/A-18s. On page 7 of his report, Rogers goes on to say, "the average mission capable rate in 2006 for the KAF F/A-18 was approximately 67%. That means that on any given day there were only 26 of 40 aircraft available and of those 26, 6 aircraft were sent to stand alert, which left only 20 out of 40 aircraft to train with. The number of aircraft available to fly is confirmed by DynCorp's "Kuwait Air Force Aircraft Status Report" (daily report) as nearly always being in the low 20s. Also, on page 4 of Glenn Rogers "Pilot Training and Readiness" report, he states the KAF flew 3,919 total F/A-18 hours. However, on page 1 of Bob Hahn's "KAF-18 Monthly Maintenance Plan" (MMP) for May 2007, he states in section 2 the project flight hours for May to be 400. Projected across 2007, an average of 400 hours per month would equal roughly 4,800 total hours for the year. Bob Hahn's MMP exaggerates available flight hours by 22% (4,800/3,919). Moreover, for DynCorp to facilitate the 8,400 F/A-18 hours per year, which Rogers states as the minimum for the KAF to maintain basic pilot proficiency and safety, an increase of 114% (8,400/3,919) was required. Instead

40

False Claims Act Complaint

of aggressively attacking this problem, DynCorp ignored it—and maintained an air of "plausible denial" by blaming the Kuwait Air Force. But it was DynCorp that failed to train KAF maintenance personnel and maintain F/A-18 aircraft per the required 4790 standards. Additionally, DynCorp covered these failures up with fraudulent reports, failed to alert KAF or US senior officials, and prevented QA audit reports from reaching senior KAF leadership.

76.    Ultimately, Relator was fired by Bob Hahn — apparently for attempting to address DynCorp's shortfalls, and because the Relator represented a risk if he were to ever inform the KAF Commanding General, General Al Otaebi, of the QA audit reports that Hahn directed Relator to remain quiet about. Hahn cited two incidents as the basis for the firing, which Relator believes were pretextual set ups.  The two incidents involved obvious prearranged setups with Kuwaiti gate guards at the Al Ahmadi oil field. Both occurred within a short time of each other. The first incident was when the Relator was stopped at the entry gate to Al Ahmadi oil field while going out to Al Jaber Air Force base.  The Kuwaiti guard stopped Relator and refused to let him pass, and Relator had to drive around the oil field to get out to the air base. Relator was stopped by the guard at the gate, who physically grabbed him and pulled Relator out of his car. Relator didn't push back, but the guard took me inside and spoke to the guard's commander who was there to talk to Relator. Without looking at his identification, the gate guard commander already knew Relator's name.  Relator

41

believes the guards expected him to fight back, but he did not do so, since he had been advised previously not to resist because it would get him in trouble.  On a return trip from Al Jaber air base (on the way back from the base), Relator was stopped again for no apparent reason. Again, he was turned back and told to go around the oil field.  While both incidents were non-events (nothing happened except the Relator was stopped and told to go around), Hahn used these as reasons for dismissing the Relator. Prior to these events, Relator had been told by DynCorp personnel that several prior "do-gooders" had been stopped by gate guards, two of which actually resulted in shoving matches with guards. Personnel involved in "gate incidents"—shoving or not—were subsequently fired by DynCorp.

77.      Bob Hahn cited both gate incidents in firing Relator.  However, one day after the second incident, a KAF sergeant at the KAF Commanding General's office told Relator he had heard both gate incidents were a set up.  The KAF sergeant said Hahn had fired others though such pretextual gate incidents, and that Hahn was a good friend with a senior official at the Kuwaiti Minister of the Interior, who could manufacture such incidents for Hahn's benefit.

78.      Relator was not surprised at this course of events.  LCDR Gustafson, two KAF personnel at the Commanding General's headquarters, and a British exchange pilot had previously advised Relator to be careful because his

False Claims Act Complaint

immediate predecessor as Command Staff Advisor to General Al Otaebi was

discharged on the basis of a "gate incident" manufactured by Bob Hahn.

79.     Additionally, Relator was told that three other prior DynCorp

employees had "tried to fix the problems with the F/A-18 maintenance." All were

fired before Relator first arrived in Kuwait as a DynCorp employee. Relator was

told by multiple KAF and DynCorp personnel that Bob Hahn had Relator's

immediate predecessor, a retired Navy Commander and F/A-18 pilot, fired by

engineering a similar "gate incident" confrontation with Kuwaiti guards. The

retired Navy Commander had reportedly first gone to DynCorp with his findings.

After making no headway with DynCorp, Relator's predecessor was considering

starting his own business to compete with DynCorp. According to KAF

personnel at the KAF Commanding General's offices, General Al Otaebi

discussed this option with the Relator's predecessor. This indicated the level of

seriousness the KAF was giving DynCorp's failure to perform.

80.     Immediately after Relator left the employ of DynCorp and returned

to the U.S., Relator spoke for 30-40 minutes on the telephone with Bob Hahn's

boss at DynCorp in Texas. Relator informed him of the results of his

investigation, including the failed inspection reports. He did not express any

surprise upon hearing this news. Instead, he asked Relator, "is Bob Hahn doing a

good job managing the program in Kuwait?" Relator replied, "No — because there

is an imminent risk of another flight mishap due to maintenance malpractice. The

43

problem is easy to fix, and only requires DynCorp personnel to perform basic tasks per the contract and the 4790."

## COUNT ONE

### False Claims Act, 31 U.S.C. § 3729(a)(1)

#### (Against all Defendants)

81.    Relator re-alleges and incorporates by reference all paragraphs set forth above.

82.    By virtue of the acts described above, DynCorp knowingly, or acting with deliberate ignorance or reckless disregard, presented or caused to be presented to the United States and others false and fraudulent claims for approval or payment in violation of the FCA.

83.    These acts occurred dating from the initial award of the Kuwait Air Force F/A-18 contract to DynCorp in September 1997 through the end of that contract and its renewals, which Relator is informed and believes occurred in December 2010.

84.    Because of these acts the United States has sustained damages.


## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(2)

#### (Against All Defendants)

85.    Relator re-alleges and incorporates by reference all paragraphs set forth above.

44

86.     By virtue of the acts described above, the Defendants knowingly, or acting with deliberate ignorance or reckless disregard made, used, or caused to be made or used, a false record or statement material to and to get false or fraudulent claims paid or approved by the United States and others in violation of the FCA.

87.     These acts occurred dating from the initial award of the Kuwait Air Force F/A-18 contract to DynCorp in September 1997 through the end of that contract and its renewals, which Relator is informed and believes occurred in December 2010.

88.     Because of these acts the United States has sustained damages.

## PRAYER FOR RELIEF

WHEREFORE,   RELATOR   DEMANDS   JUDGMENT   AGAINST DEFENDANTS AS FOLLOWS:

1.     On Counts One and Two, judgment against Defendants for treble the damages sustained by the United States, plus civil monetary penalties of $5,500 or $11,000 for each false claim and each statement or record in support of a false claim;

2.     For costs, fees and other relief as may be just and proper;

3.     For a ten percent (10%) surcharge in the amount of the debt owed pursuant to 28 U.S.C. §3011.

45

False Claims Act Complaint

Dated:        August 29, 2013                Respectfully submitted,

Mark I. Labaton
MOTLEY RICE LLC

By: _____
    Mark I. Labaton
    Attorney for Relator

False Claims Act Complaint